## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARLENE J. CAMPBELL,

          Plaintiff,

v.                                                        No. CIV 04-898 LFG

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

          Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Marlene J. Campbell ("Campbell") invokes this Court's jurisdiction under 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner").  The Commissioner determined that Campbell was not eligible for disability

benefits.  Campbell moves this Court for an order reversing the Commissioner's final decision, or

alternatively, to remand for a rehearing.  [Doc. 8.]

Campbell was born on June 28, 1962 and was 41 years old when the administrative hearing

was held.  She has an eleventh or twelfth grade education.[1]  Campbell lives currently lives in Clovis,

New Mexico with her husband and 11-year old son.  [RP at 69, 111.]  She previously lived in

---

[1]In her application for disability benefits, Campbell wrote that she had a high school education, and had attended school through the twelfth grade.  [Record Proper ("RP") at 84.]  However, during the administrative hearing, she testified that she had dropped out in the eleventh grade and did not obtain her high school degree. [RP at 297.]

California for many years and initiated her disability benefit request in California.  [RP at 67-70.]
Campbell worked for over twenty years in several positions at a hospital in California.  Her past
relevant work experience was as a patient accounts representative, audit supervisor and computer
systems coordinator.  [RP at 15, 91.]

On February 26, 2002, Campbell applied for disability benefits, alleging an onset date of
January 21, 2002 due to irritable bowel syndrome ("IBS"), gastroesophageal reflux disease
("GERD"), ulcer, hiatal hernia and acute gastritis.  [RP at 67.]

Campbell's application for disability benefits was denied at the initial and reconsideration
stages, and she sought timely review from the ALJ.  An administrative hearing was held on November
21, 2003 in Roswell, New Mexico.  In a decision, dated April 7, 2004, ALJ Gary Vanderhoof found
that Campbell was not disabled within the meaning of the Social Security Act ("the Act") and denied
the benefit request.  Campbell challenged this determination to the Appeals Council which denied her
request for review on June 9, 2004.  [Tr. at 5.]  This appeal followed.

### Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]
The burden rests upon the claimant to prove disability throughout the first four steps of this process,
and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the
Commissioner at step five.  If, at any step in the process, the Commissioner determines that the
claimant is or is not disabled, the evaluation ends.[3]

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]  Here, Judge Vanderhoof made his determination of non-disability at step four.

---

[4] 20 C.F.R. § 404.1520(b) (1999).

[5] 20 C.F.R. § 404.1520(c) (1999).

[6] 20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7] 20 C.F.R. § 404.1520(e) (1999).

[8] One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9] 20 C.F.R. § 404.1520(f) (1999).

[10] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

3

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing Campbell's testimony, medical records, symptoms, complaints, and having heard testimony from a vocational expert, the ALJ rejected Campbell's claim for benefits at step four.

4

He concluded that Campbell's RFC did not preclude her from returning to her past relevant work as an audit supervisor and patient accounts representative. [RP at 18.] In reaching this decision, Judge Vanderhoof made the following findings: (1) Campbell had not engaged in substantial gainful activity since her alleged onset of disability; (2) Campbell had an impairment or combination of impairments considered "severe", consisting of diabetes, depression, anxiety and GERD; (3) the severe impairments did not meet or medically equal any of the listed impairments; (4) Campbell's allegations regarding her limitations were not totally credible; (5) Campbell had the RFC to lift 10 pounds occasionally. She could occasionally, bend, stoop, and crawl. She could not balance or work at unprotected heights, and could not climb ladders, scaffolds or stairs. She could perform routine work at a competitive rate; (6) her past relevant work as an audit supervisor and patient accounts representative did not require performance of work-related activities precluded by her RFC; and (7) Campbell's medically determinable impairments of diabetes, depression, anxiety and GERD did not prevent her from performing her past relevant work. [Tr. at 18.] Ultimately, Judge Vanderhoof concluded that Campbell was not disabled as defined by the Social Security Act at any time through the date of his decision. [Tr. at 18-19.]

In this appeal, Campbell argues that the ALJ erred in the following ways: (1) by not considering her treating physician's opinions; (2) in determining that she was not totally credible in regarding her limitations; (3) in deciding that Campbell retained the RFC to work; and (4) in failing to ask the vocational expert the proper hypothetical questions. [Doc. No. 9.] The Commissioner claims that substantial record evidence supports her final decision and that the ALJ applied the correct legal standards in evaluating the evidence. [Doc. 10.]

## Summary of Campbell's History and Medical Care

Campbell was born and raised in California.  She worked for approximately 22 years at the Hoag Memorial Hospital Presbyterian in Newport Beach, California.  [RP at 242.]  She told a consulting psychologist for disability services that she was placed on medical disability in May 2001.[11] [RP at 178, 242.]  Campbell stated on a disability form that she stopped working on January 21, 2002 because her doctor felt she no longer could work.  [RP at 78.]  In one medical record, dated January 29, 2002, the doctor appears to have written that Campbell was afraid of being fired.[12]  [RP at 187.] In her treating physician's letter, dated June 20, 2002, the doctor stated that Campbell had "finally quit her job" and that she was under increased stress and had unrelenting diarrhea that prevented her from performing her job duties.  [RP at 178.]  In July 2002, Campbell and her family moved to Clovis, New Mexico.  Campbell's husband's family lives in the area.  [RP at 242.]

There were no employment or other informative records supplied that show what disability program Campbell was on or for what period of time, if she was absent from work frequently, and/or the exact date Campbell separated from her employment.  There are no notes in the administrative record indicating Campbell was out on disability that were provided to her employer.  The ALJ observed that Campbell quit her job close to the time she relocated to New Mexico.  [RP at 11.]

Campbell's primary treating physician in Newport Beach, CA was Dr. Robert Schiffer. He began treating Campbell in August 1993 and saw her on a frequent basis between 2001 and mid-2002 before she moved to New Mexico.  While Dr. Schiffer stated in his June 20, 2002 letter that Campbell

---

[11]Her treating physician's letter also notes that Campbell was placed on disability in May 2001.  [RP at 178.]  According to that letter, Campbell also was placed on disability on April 15, 2002 and was continued on disability.  It is unclear whether this was a work-related disability program or a state disability program.

[12]Many of the medical records are virtually illegible.

6

first complained of severe abdominal pain with GERD and diarrhea in February 2000, the medical records that are part of this administrative record begin in 2001.  [RP at 16, 232,  242 ].  A disability report filled out by Campbell states that abdominal pain, diarrhea and nausea first bothered her on January 21, 1978, but there are no supporting medical records as to that year.  [RP at 78.]

### 2001 Records

The first medical record, dated January 22, 2001, is difficult to read.  It appears that Dr. Schiffer was seeing Campbell every week or two during this time frame, although there is no explanation for the frequency of these visits.  Each page of Dr. Schiffer's medical records contains notes for 2-3 visits -- each visit is described in about 3 or 4 lines of handwriting that is almost illegible.  Most of Dr. Schiffer's records document Campbell's weight, blood pressure, and medications and further indicate that Campbell was to return to Dr. Schiffer on a regular basis, i.e., two to six weeks usually.

The January 22, 2001 record shows Campbell weighed 228 pounds and had no weight loss. It appears that her thyroid levels were checked and she had a needle aspiration into her left breast but that "no tumor" was indicated.  The record states something about a "dizzy spell." [RP at 232.]

On January 29, Campbell complained of dizzy spells.  She had stopped all weight medications. She suffered from light headedness and tingling in her feet.  Campbell complained of intermittent depression. Campbell's dizziness was worse and there is something written about "pt exercise".  She was referred for a neurology consult.  [RP at 232.]

Campbell's January 30 cardiology exercise lab test results were negative for myocardial ischmia or arrhythmia.  The technician noted that she showed adequate exercise tolerance but suspected her weight interfered with better exercise performance.  [RP at 230.]

7

On February 12, 2001, Dr. Schiffer's record indicates Campbell had problems with balance. Her dizziness had increased. She had a possible sinus infection. She gained 8 pounds in three weeks. She was to "fly next week" and to return in 2-3 weeks. There is some notation about "time at work," but it is illegible. [RP at 232.]

On February 15, Campbell's Neurolite Spect Brain Perfusion Scintiphotogram was normal. [RP at 161.] Her test for a sinus infection was negative. [RP at 160.] Dr. Schiffer's February 22 record notes that some of her recent testing had been normal, that she had seen an eye doctor and those results were ok. [RP at 224.]

The March 20 medical record states that Campbell had flown to Cincinnati. She had an inflammation of her left inner ear. Campbell was given Valium and that helped a little. She still had dizziness. [RP at 224.]

On May, 2, Campbell still complained of dizziness. She had increased stress at work because of "financial, personal" reasons. Medication had helped "a little." The record states "can't work; not driving." She complained of anxiety and had taken Ativan. The record appears to state "tendency to diabetic." Campbell was to see a second ENT. [RP at 224.]

On May 23, 2001, Campbell was given a noninvasive extracranial evaluation for vertigo and a duplex scanning of her carotid arteries. The results were entirely normal. [RP at 229.] On May 31, Dr. Schiffer noted that Campbell complained of persistent dizziness. She was referred to endocrinology. The note indicates "extend disability x3 weeks." [RP at 214.]

On June 6, 2001, Campbell was seen by an endocrinologist, but the endocrinology records are more difficult to read than those of Dr. Schiffer's. According to the record, Campbell appears to have been diagnosed with DM (diabetes) about 2 years ago. She was on low doses of a medicine

used to treat diabetes.  Her weight had increased by 40 pounds since 2000.  Campbell had some anxiety and depression, for which she was being treated.  Campbell had some dizziness and vertigo but the note appears to indicate the dizziness had resolved and then returned, and at that point still occasionally persisted.  [RP at 169.]

On June 14, 2001, Campbell was again seen by the endocrinologist.  The record is mostly illegible.  [RP at 168.]  It appears that Campbell's medications for her diabetes were being adjusted.  On June 18, Dr. Schiffer saw Campbell.  The record states that she was to return to work on 6/25/01.  She had "type II DM."  Dr. Schiffer wrote "no dizziness anymore!"

On July 16, 2001, Dr. Schiffer wrote that "pt feels good" and "dizziness is fine".  [RP at 214.]  On July 18, Campbell saw the endocrinologist.  The record appears to note something about diarrhea and then states in quotes "can live i it".  Most of the record is illegible.  [RP at 167.]

On August 29, 2001, the endocrinology record seems to indicate that Campbell's DM II is under good control.  [RP at 166.]  On September 4, 2001, she saw Dr. Schiffer who noted  "pt working."  Her dizziness on this date was "fine."  Campbell complained of reflux.  She had increased her exercise.  [RP at 209.]

On October 16, 2001, Campbell complained to Dr. Schiffer of vomiting for 2 days and of diarrhea.  He wrote "stomach flu – now getting better", "dizziness is fine."  She complained of major heartburn but Zantac and Prilosec helped.  [RP at 209.]

On December 5, 2001, the endocrinologist indicated she was to see a podiatrist soon.  (No podiatry records were made part of the administrative record.)  Most of the record cannot be read.  [RP at 165.]  On December 13, 2001, Campbell saw Dr. Schiffer for a follow up.  She had severe GERD and also was referred to a podiatrist and a dermatologist  Her sister was noted as having

9

Hepatitis C.  Campbell was having lab tests for a number of things, including Hepatitis A, B and C. [RP at 201.]

### 2002 Records

On January 3, 2002, Campbell visited the Hoag Hospital ER for gastritis and diarrhea.  She complained of an acute onset of upper abdominal pain.  [RP at 151.]  She was x-rayed for abdominal pain, and the study was entirely normal.  She had an abdominal ultrasound for gastritis and diarrhea.  The test showed that her liver was highly echogenic without focal mass" and that all other organs were unremarkable.  Her chest x-ray was entirely normal.  [RP at 200.]

On January 21, 2002, Campbell claims she was no longer able to work and was disabled due to brittle diabetes, IBS, GERD, ulcer, hiatal hernia and acute gastritis.  [RP at 15, 67.]  On January 23, an outpatient esophagogastroduodenoscopy was performed.  A moderate hiatal hernia was seen.  She had gastroesophageal reflux and acute distal inflammation of the esophagus.  She had severe hemorrhagic inflammation of the body and antrum and moderate bulbar duodenitis.  Her gastric biopsy was negative.  [RP at 146-47.]  On January 24, the CT scan of Campbell's abdomen (for complaints of abdominal pain) showed that her liver was diffusely hyperdense, consistent with diffuse fatty infiltration.  The results were considered mostly normal.  [RP at 129.]  The CT scan of her pelvis showed no pelvic mass or adenopathy.  Her uterus, right ovary and bowel were normal.  [RP at 130.]

Dr. Schiffer's January 29th medical record indicates "patient on disability."  Campbell was still having pain, made worse with eating.  She complained of severe stress and was afraid to be off work and afraid of being fired.  Her stress at home had increased.  Campbell declined psychiatric help. [RP at 187.]

The February 12, 2002 shows Campbell had stopped smoking for five days with the help of Zyban.  She had less reflux.  The record states something about caffeine but it cannot be read.  Dr. Schiffer was attempting to reduce some of the medications Campbell was taking including Vicodin, Ativan and Ultram. The record states "detoxification next."  Campbell was still exercising.  She again declined psychiatry.  Her disability was extended to April 15, 2002, and she was to return in one month.  [RP at 187.]

On February 22, Campbell complained of severe abdominal pain.  She had nausea and was vomiting.  She had lower abdominal pain and diarrhea but without blood.  She was drinking two cups of coffee per day, it appears.   The record notes "pt missing work."  [RP at 201.]

On February 26, 2002, Campbell filled out her DIB application form.  [RP at 67-70.]  On the disability report, Campbell gave no names of others who might have information about her medical condition as she did not want others to discuss her condition with the agency.  She stated that she could not lift, bend, sit, stand or walk for any extended time.  She had abdominal pain and needed to be close to a restroom at all times.  She had constant nausea.  This condition had first bothered her on January 21, 1978.  When she had worked at the hospital, she was able to walk, sit, and stand for 4 hours per day, climb 2 hours a day and stoop, etc. 1 hour per day.  She wrote for 7 hours a day.  She lifted less than 10 pounds for her job.  Campbell was taking Carafate, Nexium, Zantac, Vicodin and Compazine.  [RP at 77-87.]

On February 26, 2002, Campbell called Dr. Schiffer.  She was out of Ultram and wanted a refill.  Office staff told her that it was too soon for a refill and that the refill would be denied as 360 pills had been taken within 35 days.  Campbell hung up.  The record indicates that Campbell spoke

to Dr. Schiffer after hours and that the doctor called in a prescription of 50 Ultram for Campbell. [RP at 186.]

On March 5, 2002, Campbell was seen by the endocrinologist. The record is illegible. [RP at 164.] On March 12, Campbell had an appointment with Dr. Schiffer. She still complained of abdominal pain. She had stopped smoking for 30 days with the help of Zyban. [RP at 186.]

On March 18, 2002, Dr. Schiffer filled out a Gastrointestinal Disorders Impairment Questionnaire for Campbell's disability request. He checked off diagnoses of reflux disease and ulcer or complication of ulcer disease, which he described as hemorrhagic gastritis, GERD, IBS with diarrhea. Her prognosis was "fair." With respect to positive clinical findings, Dr. Schiffer checked: chronic diarrhea, abdominal pain and cramps, nausea, pain, and vomiting. He also wrote in Diabetes Mellitus ("DM") and indicated that Campbell's blood sugar test results supported the diagnosis of DM. Campbell's primary symptoms were chronic abdominal pain, chronic diarrhea, nausea and vomiting. Dr. Schiffer indicated that Campbell's symptoms and functional limitations were reasonably consistent with her physical and/or emotional impairments. With respect to pain, Campbell had upper abdominal pain – stabbing and twisting, for 24 hours at a time. The pain was 7 of 11 on a good day and 11 on a bad day. The noted severity of her pain/symptoms was "severe." Campbell was taking Tricor, Lipitor, Lomotil, Compazine, Zantac, Ultram, Ativan, Vicodin, and Prilosec. [RP at 133.] Dr. Schiffer indicated that Campbell's impairments were expected to last at least 12 months and that she was not a malingerer. Emotional factors contributed to the severity of her symptoms and limitations. Campbell frequently experienced pain, fatigue or other symptoms severe enough to interfere with her ability to concentrate and be attentive. [RP at 134.] Dr. Schiffer marked the box "incapable of even 'low stress'" at work and stated she missed work frequently and spent an

12

inordinate amount of time in the restroom.  In his estimation, Campbell was able to sit only 0-1 hour a day, stand/walk 0-1 hour a day, and unable to sit continuously in a work setting.  Campbell needed to get up and move around hourly before sitting.  She should not stand or walk continuously in a work setting.  Dr. Schiffer opined that Campbell should never carry 0-5 pounds.  She would miss work more than three times per month and needed ready access to a restroom once an hour.  Dr. Schiffer expected Campbell to be away from her work station for an average of 15-30 minutes while using the restroom.  He believed the earliest date that these limitations occurred was February 17, 2000, although there is no supporting medical record provided before 2001.  [RP at 131-36.]

On March 19, 2002, Campbell was given a hepatobiliary scintiphotogram for her complaints of abdominal pain.  The results were normal for liver function and flow and for her biliary system.  There were no obstructions.  [RP at 139, 185.]

On April 9, 2002, Campbell's work history report indicates she provided technical computer support to staff along with training.  She walked, stood, sat, knelt and stooped as required by the job.  She carried boxes of copier paper infrequently, weighing up to 20 pounds.  [RP at 91.]

On her pain questionnaire, Campbell stated that her upper abdominal pain began in November or December 2001.  She suffered sharp stabbing and ringing pain to the middle/lower abdominal areas for 24 hours.  Anxiety and stress brought it on but it was already usually there.  The pain lasted all day, and rest relieved it.  She took 3 pills of Vicodin which relieved the pain "somewhat."  The pain medication made her drowsy.  Campbell usually stayed around the house because she did not know when the diarrhea would come on.  She used to go walking, shopping, driving and visiting.  She also worked, went to movies and did housework.  She no longer could do any of these activities because of pain and diarrhea.  She needed assistance in driving and doing errands.  She could walk 20 feet,

stand for one hour and sit for one hour.  Campbell needed help with house-keeping, cooking, dishes, and shopping.  [RP at 100-101.]

On April 9, 2002, Campbell saw Dr. Schiffer.  She had not been smoking for two months and quit the Zyban.  She complained of dizziness.  The record states "patient quit job at hospital."  It also states "State disability x6 mo".  On April 11, 2002, her records were sent to Blue Cross of California. [RP at 182.]

A medical disability consultation was obtained on April 24, 2002.  It appears that the consulting physician reviewed Campbell's alleged impairments, some of the records and test results and concluded that the impairments were non-severe.  [RP at 162]

On April 30, 2002, Campbell's underlying request for disability was denied.  On May 7, 2002, she had an appointment with the endocrinologist.  The record indicates Campbell was moving out of state and that she should find a new doctor in New Mexico.  The record also states that the doctor wrote a note for the patient, but that note does not appear to be part of the record.  Most of the record is illegible.  [RP at 163.]  Campbell saw Dr. Schiffer again on May 9, 2002, at which point, she still complained of nausea, diarrhea and abdominal pain.  [RP at 181.]  The record notes that Campbell was to leave for Clovis, New Mexico, and that there was a call about a letter.  [RP at 181.]

On June 18, 2002, Campbell saw Dr. Schiffer for the last time, according to the medical records.  She had been seen in the ER on June 5 for abdominal pain.  No corresponding ER record was made part of the administrative record.  The June 18 record indicates that Campbell's medical records were to be sent for January 2001 to present.  Campbell was moving to New Mexico and was to see a doctor in a clinic in Lubbock for an "ERCP" (which apparently is a medical test). [RP at 181.]

14

On June 20, 2002, Dr. Schiffer wrote a letter on behalf of Campbell.  He stated that he had treated Campbell since August 13, 1993, and that she complained of severe abdominal pain, GERD and diarrhea since February 2000.  [RP at 180.]  Campbell was placed on appropriate medications for Peptic Ulcer Disease and Reflux symptoms, including Prilosec, Carafate, and Zantac.  "These measures along with dietary modifications did not relieve her abdominal pain.  She was then placed on Vicodin every four hours as needed."  Campbell continued to have epigastric pain, nausea, heartburn and dizziness.  Over "the next few months", she had increased diarrhea and dizziness.  The colonoscopy[13] indicated IBS without evidence of Inflammatory Bowel Syndrome.  Campbell was diagnosed with DM and treated with oral agents.  She had tried several weight loss programs unsuccessfully.  [RP at 180.]  Dr. Schiffer wrote that in January 2001, Campbell complained of dizziness and tingling in her feet.  She was seen by an ENT and a neurologist.  Brain images were normal.  She was seen by Dr. Schiffer on an average of monthly "during most of this period" and had tried various medications, including Niacin, Antivert, Neurontin, Actos, Glyburide, Compazine, Ativan, Prilosec, Zantac, Carafate, Vicodin, Ultram, Lomotil, Glucophage, and Lipitor.

Campbell was "placed on disability in May 2001."  She was unable to work because of frequent diarrhea.  She returned to work but continued to experience stress and anxiety.  She declined psychiatric assistance.  She was "placed on disability until April 15, 2002."  Campbell was seen by a General Surgeon[14] for continued abdominal pain and diarrhea and referred to the university for further consultation.  Her March 2002 scintiphotogram was reported as normal.  She was given Zyban and successfully stopped smoking.

---

[13]The colonoscopy testing and interpretation do not appear to be part of the administrative record.

[14]This record does not appear to be part of the administrative record.

Campbell continued on disability and was to have a number of other tests, including an Endosonogram, ERCP, and a possible MRCP.  They were delayed, however, due to her move to New Mexico.

In his letter, Dr. Schiffer wrote that "the patient finally quit her job."  Campbell was under increased stress and had unrelenting diarrhea which did not allow her to complete her duties.  "She had also become habituated to Vicodin and Lomotil."  Dr. Schiffer was uncertain as to her prognosis for recovery.  She needed further gastrointestinal and surgical evaluation as well as psychiatric treatment.  She needed to be detoxified and treated for addiction to various medications.  Dr. Schiffer stated that it was unlikely that her condition would in improve in 12 months and also unlikely that she could perform full time work.   He gave her diagnoses of: abdominal pain, DM, GERD, Hypercholesterolemia, Paroxysmal Positional Vertigo, Anxiety, Depression, Diarrhea, and Addiction to Vicodin and Lomotil.  [RP at 179.]

In July 2002, Campbell moved to New Mexico.  [RP at 242.]

On September 23, 2002, Campbell had an abdominal radiology series at the Clovis Hospital. Her heart and mediastinum were normal.  The testing was unable to exclude a possible mass in her right kidney so an ultrasound was recommended.  Her chest views were normal.  [RP at 241.]  The October 8, 2002 ultrasound was normal.  Both kidneys were normal and there was no renal mass. [RP at 235.]  On October 11, 2002, Campbell was given an Air Contrast Upper GI Series and Small Bowel Follow Through.  It was unremarkable.  There was mild gastroesophageal reflux.  [RP at 236.]

On October 14, 2002, Dr. Edward Bocian, a consultative physician, noted that Campbell had alleged disabilities from IBS and brittle DM (which he noted as being under excellent control), GERD, HH, acute gastritis.  Dr. Bocian stated that she was "obese at 5' 3" tall, and throughout her

complaints of abdominal pain has been gaining weight - eg 229 1/29/02 and 234 6/18/02."  The treating physician "suspects psychiatric overlay" but reports that Campbell rejected a consult. "Complaints of pain exceed objective findings."   Dr. Bocian concluded Campbell's functional restrictions, by program standards, were non-severe,  [RP at 237.]

On October 17, 2002, Campbell was seen for the first time by Jayashree Sinha, MD (Internal Medicine/Rheumatology) in Portales, New Mexico.  Dr. Sinha noted Campbell's past diagnoses and mostly normal test results.  Dr. Sinha stated that Campbell was diagnosed with IBS because nothing specific was concluded from her testing.  According to this record, Campbell was found to be diabetic in 2001.  Dr. Sinha observed that "in a sense she has had many investigations done but they have not really found anything, but at present she carries diagnosis as mentioned above."   Campbell was taking Glucophage, Tricor, Lipitor, Nexium, Ativan, Vicodin, Lomotil and Compazine.  She complained that day of bilateral hip pain, worse when walking and "she also wanted her disability papers filled out." [RP at 282.]

On November 1, 2002, Campbell filled out a daily activities questionnaire.  She stated that she essentially was unable to do anything.  She was in the bathroom constantly with diarrhea.  She ate bland foods and had three meals a day.  Campbell did not cook but was able to read some and watch television in the evening.  Her friends visited her every few weeks and they sat and talked. Campbell did not belong to social groups.  Her pain and diarrhea kept her up at night.  She had had anxiety, depression and panic attacks "for awhile."  She had never been hospitalized.  She could not walk one block without stopping.  She could dress herself but became extremely tired.  [RP at 107-115.]

17

On December 12, 2002, Campbell was seen by a clinical psychologist, Mark McGaughey, in Clovis. McGaughey noted Campbell's diagnoses and symptoms with a start date of February 2000. Campbell stated she began experiencing panic attacks at work and could not breathe. At that time, she felt very shaky, as if she was going to jump out of her skin. These panic attacks occurred daily and lasted 30 minutes. She told the psychologist she had to leave her job in California. She experienced pain 24 hours per day and suffered from diarrhea ever hour during the day. She was unable to do anything and was up and down all night with pain. However, she was able to sleep 6-7 hours a night. She read a lot. She experienced some depression secondary to current finances and ongoing pain and frustration with her medical problems. Campbell stated she was able to cope with stress quite well at work prior to her medical problems. She quit smoking in February 2002. Her appetite was poor. McGaughey diagnosed her with depressive disorder NOS and multiple medical problems. Her GAF was 60. [RP at 242.] In the psychiatric disability--ability to work form, McGaughey concluded that Campbell had mild or no limitations. [RP at 245.]

On December 15, 2002, Campbell saw Dr. Sinha. Her IBS was the same. She needed Lomotil every day. She suffered from left hip pain for 4-5 months, which she initially attributed to a long drive from California to Portales. The x-ray of her hip was normal. Her prescription for Vicodin re-filled. [RP at 281.]

**2003 Records**

In January 2003, LeRoy Gabaldon filled out a Psychiatric Review Technique form as to Campbell's psychological impairments. He concluded that Campbell had a depressive disorder but that it was non-severe, and that she had mild or no limitations. Mr. Gabaldon stated that there were no indications of thought disorder, substance abuse or severe cognitive limitation. [RP at 248.]

18

On January 7, 2003, Dr. Sinha saw Campbell.  Campbell had not had an MRI done because she discovered her insurance paid only a minimal amount.  As for diabetic control, her blood sugar was between 120 and 190.  Occasionally, when stressed, it fluctuated between 150 and 200.  Her complaints that day included hot flashes and night sweats.  Campbell wanted to stop smoking again. [RP at 274.]

On November 21, 2003, the administrative law hearing was held in Roswell.  Campbell was represented by counsel.  She discussed her diabetes first, acknowledging that she was not insulin dependent.  She stated that the medications she took did not control it.  Campbell added that she was diagnosed with diabetic neuropathy of her feet which was very painful.[15]  She was unable to stand for any length of time and it was difficult to wear shoes.  She had problems throughout the day with her blood sugar levels and shakiness.  She tried to keep her feet elevated to alleviate pain and swelling, and she needed to do that 8 times a day.  Campbell continued to have gastrointestinal problems with diarrhea which was ongoing and uncontrollable.  It could happen as often as once an hour, and it hit suddenly.  Medication had not really helped it.  Campbell still had severe upper abdominal pain, for which she used a heating pad daily.  She sat down with a hearing pad 10 times a day for about 20-30 minutes.  Although she needed to have a test conducted regarding this condition, the test was too expensive.

Campbell continued to suffer from vertigo every 1-2 days.  She felt anxious and depressed but did not seek counseling as she could not afford it.  Campbell did not do housework or cooking. She drove less than one mile per week because of diarrhea.  She had problems with sleep and was up

---

[15]There is no corresponding medical record regarding this diagnosis that is part of the administrative record.

most of the night.  She slept only 30 minutes at a time.  She had to push herself to eat and her appetite was poor.  Campbell testified that she had missed a lot of work in California due to her medical problems.  She quit voluntarily because she felt she would be fired.

The ALJ asked a few questions about Campbell's weight which was now about 230-235 pounds in comparison to 240 pounds when she filed for benefits.  Campbell originally indicated she completed 12 years of education on the disability application form but now stated that she did not finish 12th grade.  She had quit smoking again as of the date of the hearing.

The ALJ asked some hypotheticals of the VE who was present at the hearing.  Judge Vanderhoof asked the VE to consider someone who did not complete high school and was restricted to lifting no more than 20 pounds occasionally and 10 pounds frequently, who could occasionally climb but could not balance, who could perform routine repetitive work and was mildly limited in dealing with the public.  The VE testified that she could return to her work as an account representative.  If Campbell were further restricted to a 10-pound lifting restriction and occasional sitting/standing, the VE testified that Campbell could do her account representative job as she had described it.  If she was limited to sedentary work, or sitting for 6 hours of 8, she could perform a data entry clerk's work.  [RP at 284-302.]

On April 7, 2004, the ALJ issued an unfavorable decision.  Judge Vanderhoof stated that he gave Campbell the benefit of the doubt in determining that her impairments had more than a minimal effect on her ability to work.  He concluded that her alleged impairments were generally controlled by treatment or that some of the impairments had not been diagnosed and were not supported by the objective medical record.  The ALJ discounted her treating physician's opinion as not being in "accord with the record as a whole."  He noted that Campbell herself had said she could stand for one

20

hour and sit for one hour, in contrast to the treating physician's conclusions.  The ALJ decided that Campbell retained the RFC to lift 10 pounds occasionally, perform occasionally bending, stooping, crawling.  She could not balance or climb ladders.  Based on her RFC, the ALJ noted that the VE testified she could return to her prior relevant work as an audit supervisor or patient accounts representative.  [RP at 11-17.]

<u>Analysis</u>

**TREATING PHYSICIAN'S OPINIONS**

Campbell argues that the ALJ erred in not considering her treating physician's opinions.  The argument on this issue, however, is not persuasive.[16]  Nonetheless, the Court disagrees with the Commissioner that the argument should be stricken for failure to properly frame or develop an issue.  Thus, the Court will address this argument and agrees with Plaintiff that the case should be remanded so that the ALJ can further explain why he gave virtually no credit to the treating physician's opinions.[17]  Because of its decision to remand on this issue, the Court does not reach Plaintiff's additional arguments.

---

[16]Plaintiff failed to set forth the specific standards as to the treating physician's rule and why or how the ALJ allegedly failed to comport with those standards.  Plaintiff's counsel's use of unanswered questions in his brief was ineffective.

[17]The Court elects to remand under the circumstances of this case.  However, Plaintiff should not interpret this decision to remand as evidence of the strength of Plaintiff's case, nor is any indication to the ALJ that the case warrants an award of benefits.  Here, the Court concludes that the ALJ has failed to adequately observe the treating physician's rule and/or to sufficiently provide specific, legitimate reasons for rejecting/discounting Campbell's treating physician's opinions.  Notwithstanding the decision to remand, the record evidence of alleged disabling impairments in this case appears weak.

## I.   <u>LEGAL STANDARD</u>

Under the treating physician rule, the Commissioner generally gives more weight to treating physician's opinions than to non-treating physician's opinions.  <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1119 (10th Cir. 2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).  The ALJ must first determine whether a treating physician's opinion qualifies for "controlling weight."  <u>Langley</u>, 373 F.3d at 1119 (*citing* <u>Watkins v. Barnhart</u>, 350 F.3d 1297, 1300 (10th Cir. 2003)).

> An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "consistent with other substantial evidence in the record."  "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."

<u>Watkins</u>, 350 F.3d at 1300 (internal citations omitted).  Even if the ALJ determines that a treating physician's opinions are not entitled to "controlling weight," the "treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  <u>Id.</u> (internal citation omitted).  Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

<u>Id.</u> at 1301.

After the ALJ considers these factors, he or she must give good reasons in the written decision for the weight ultimately assigned to the treating doctor's opinions.  <u>Id.</u>  If the ALJ rejects

the opinions completely, he or she must give specific, legitimate reasons for doing so.  Id.  In other words, while the ALJ is free to reject testimony, he must provide sufficiently specific explanations for discounting or disregarding a treating physician's opinion so that subsequent reviewers can ascertain the weight given to the treating physician's medical opinions and the reasons for that weight. Id.

When a treating physician gives an opinion on the ultimate issue of disability, that opinion is not entitled to controlling weight.  *See* 29 C.F.R. § 416.927(e)(1); SSR 96-5p.  However, the opinion still must be evaluated by considering the factors provided in § 416.927(d).

## II.   DISCUSSION

In this case, Campbell's treating physician, Dr. Schiffer, filled out a gastrointestinal disorder-impairment questionnaire in March 2002, in which he stated that there were positive clinical findings for Campbell's chronic diarrhea, abdominal pain and cramps, nausea, pain and vomiting and Diabetes Mellitus.  In that questionnaire, Dr. Schiffer noted Campbell had severe upper abdominal pain 24 hours a day and that she was not a malingerer.  He expected her problems to last at least 12 months and indicated that Campbell's symptoms of pain and fatigue would interfere with her ability to concentrate at work.  In his opinion, Campbell was incapable of even a low amount of stress at work. She could sit, stand or walk for only 0-1 hour per day.  Dr. Schiffer recommended that Campbell not sit for a continuous period and that she not lift 0-5 pounds.  [RP at 131-36.]

In a June 2002 letter addressed to no one in particular, Dr. Schiffer noted several objective test results (a GI endoscopy and colonoscopy) that confirmed Campbell's diagnoses of reflux esphagitis and IBS.  Campbell also was seen by a general surgeon for her continued pain and diarrhea. It appears that Dr. Schiffer or the State placed Campbell on disability for a period of months in 2001-

2002.  However, it is true that most of these records are not included in the administrative record.

Dr. Schiffer, in the June 2002 letter, again states that Campbell's condition was unlikely to improve

in a 12-month period.  He also opined that she would be unable to perform full-time work.  [RP at

178-79.]

In denying Campbell's request for DIB, Judge Vanderhoof made a brief reference to Dr.

Schiffer's June 2002 letter.  [RP at 16.]  But, the ALJ did not discuss Dr. Schiffer's opinions that

Campbell's condition was not likely to improve in 12 months, that she could not tolerate even low

stress at work and/or his opinion that she was unable to work full-time.  In his written decision, the

ALJ wrote:

> The claimant's doctor completed a checkmark form at the request of
> counsel.  The form indicates that the claimant cannot perform any
> lifting and can sit, stand, or walk only about one hour per day due to
> chronic abdominal pain (Exhibit 2F).  However, these restrictions are
> not in accord with the record as a whole and as such I give them little
> weight.  The claimant herself stated that she was able to stand for
> about one hour at a time, and sit for about an hour at a time (Exhibit
> 4E).

[RP at 17.]  This is the extent of the discussion the ALJ gave to the weight he assigned to Dr.

Schiffer's opinions.  While the ALJ identified one inconsistency between Dr. Schiffer's opinion (Ex.

2F) and Campbell's own statements about her restrictions (Ex. 4E), the ALJ did not acknowledge

Campbell's additional hand-written notation that "due to the severe pain and diarrhea these times

[meaning her ability to stand or sit for any given period] vary at all times."  [RP at 102.]  The ALJ

also failed to identify any other parts of the "record as a whole" that were not in accord with Dr.

Schiffer's stated restrictions.

The Court determines here that the ALJ erred in disregarding or rejecting the treating physician's opinions. It appears that although the ALJ stated he gave "little weight" to Dr. Schiffer's one opinion about Campbell's ability to sit and stand, etc., he essentially gave no weight to other opinions by Dr. Schiffer, including the doctor's opinion that Campbell was unable to work full-time. Indeed, it could be inferred from a reading of the ALJ's decision that Judge Vanderhoof rejected most of Dr. Schiffer's opinions. In so doing, the ALJ failed to articulate specific, legitimate reasons as to why the treating physician's opinions were not entitled to any deference or weight.

The ALJ might have concluded that Dr. Schiffer's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques." However, the ALJ neither made this statement nor set forth any facts to support such a conclusion. The ALJ should undertake the required analysis so as to determine whether Dr. Schiffer's opinions were entitled to controlling weight.

So, too, even if the ALJ determined that Dr. Schiffer's opinion(s) were not entitled to controlling weight, it is necessary to discuss the above-described factors. For example, Judge Vanderhoof did not address the fact that Dr. Schiffer had treated Campbell for about nine years and that from 2001 to 2002, Campbell frequently had appointments with Dr. Schiffer about her alleged medical impairments. According to the treatment notes that can be deciphered, Campbell's complaints were fairly consistent with respect to abdominal pain, GERD, diarrhea, nausea and dizziness. Some of the objective tests confirmed at least some of Campbell's gastrointestinal problems or symptoms.

Nor did the ALJ discuss the degree to which any of Dr. Schiffer's opinions were or were not supported by relevant evidence, except for the one inconsistency regarding Campbell's ability to sit

25

and stand.  Thus, the Court cannot determine from the ALJ's opinion whether he considered the pertinent factors and why he rejected most, if not all, of Dr. Schiffer's opinions.

Therefore, the Court determines that this case should be remanded for a re-hearing.  In assisting the reviewing Court, should this matter again be brought before it, the ALJ should ensure that legible treatment records are made part of the administrative record, and that the pertinent medical records and test results are included.[18]  As stated previously, much of Dr. Schiffer's handwriting could not be deciphered.  Even more of the endocrinologist's handwriting was illegible.  Some of the records referred to by Dr. Schiffer were not made part of the administrative record, e.g., the results of a colonoscopy, medical records from February 2000 regarding the onset of Campbell's symptoms, and disability findings by the State or Dr. Schiffer in 2001-2002.  In addition, the ALJ should consider whether a consultative exam by a gastrointestinal specialist might be appropriate, if it is demonstrated that such an examination is necessary or helpful to resolve the issue of Campbell's alleged impairments.

If after rehearing, the ALJ opts to reject or discount the treating physician's opinions, he should follow the procedure set forth by the Tenth Circuit in <u>Watkins v. Barnhart</u>, 350 F.3d at 1300, along with the pertinent provisions of the Code of Federal Regulations.

---

[18]The Court recognizes that Plaintiff bears the burden of demonstrating entitlement to DIB during the first four steps of the sequential process.  However, the ALJ is responsible for ensuring that "an adequate record is developed during the disability hearing consistent with the issues raised."  <u>Henrie v. United States Dep't of Health & Human Servs.</u>, 13 F.3d 359, 360-61 (10th Cir.1993).  Further, "[a]n ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." <u>Carter v. Chater</u>, 73 F.3d 1019, 1022 (10th Cir.1996).

IT IS THEREFORE ORDERED that Campbell's motion to remand for a rehearing before an Administrative Law Judge [Doc. No. 8] is GRANTED, as described herein.

*Lorenzo F. Garcia*

Lorenzo F. Garcia
Chief United States Magistrate Judge